# In the United States Court of Federal Claims

No. 18-266T

Filed: October 27, 2020[1]

| | |
|---|---|
| **SILVER STATE SOLAR POWER SOUTH, LLC,**<br><br>*Plaintiff,*<br><br>v.<br><br>**THE UNITED STATES,**<br><br>*Defendant.* | **Keywords:** American Recovery and Reinvestment Tax Act § 1603, I.R.C. § 1060, Intangible Assets, Tangible Property, Specified Energy Property, Partial Summary Judgment. |

*Timothy L. Jacobs*, *David S. Lowman*, *Jr.*, and *Jennifer Potts Seybold*, Hunton Andrews Kurth LLP, Washington, D.C., for Plaintiffs.

*Matthew D. Lucey*, *David I. Pincus*, *G. Robson Stewart*, *Jason S. Selmont*, and *Katherine Powers*, Trial Attorneys, U.S. Department of Justice – Tax Division, Court of Federal Claims Section, *Richard E. Zuckerman*, Principal Deputy Assistant Attorney General, Washington D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**[2]

Section 1603 of the American Recovery and Reinvestment Tax Act ("ARRA") of 2009 required the United States Treasury (the "Treasury") to provide a grant, upon application, to investors in qualifying renewable energy properties; that grant acts as reimbursement for a portion of the expense of the enterprise. Pub. L. No. 111–5, Div. B, tit. I, ARRA § 1603, 123 Stat. 115, 364–66, as amended by section 707 of the Tax Relief, Unemployment Insurance Reauthorization, and Job Creation Act of 2010, Pub. L. 111-312 ("ARRA Section 1603" or

---

[1] This Order was originally filed under seal on September 25, 2020, (ECF No. 55). The Court provided parties the opportunity to review this opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than October 26, 2020. The Joint Status Report of October 26, 2020, (ECF No. 62), indicates that the parties propose no redactions. Thus, the sealed and public versions of this Order are identical, except for the addition of keywords, the publication date, and this footnote.

[2] The case was originally assigned to Judge Elaine Kaplan and transferred to the undersigned on December 3, 2019. (ECF No. 26).

"ARRA § 1603"). The basis of the tangible personal property, with some exclusions, determined the amount of the grant. ARRA § 1603(b)(1).

In its Complaint, Silver State Solar Power South, LLC ("Plaintiff"), claims that the United States unlawfully withheld reimbursement grants that it was entitled to pursuant to ARRA § 1603. (Compl., ECF No. 1). Plaintiff requested $289,103,305 in tax grants, but the Treasury ultimately awarded only a portion, withholding $127,268,328. (Compl. at 2). Plaintiff seeks full payment of the requested grant amount. (*Id*.).

Before the Court is the United States' Motion for Partial Summary Judgment, filed on April 20, 2020. (*See* Def.'s Mot., ECF No. 42). The United States seeks partial summary judgment to determine the correct classification of certain eligible costs included in Plaintiff's tax basis. (Def.'s Mot., at 1–2). In sum, the United States asks the Court to determine what qualifies as "tangible personal property" under ARRA § 1603. (*See generally* Def.'s Mot.). On May 18, 2020, Plaintiff filed its Response. (Pl.'s Resp., ECF No. 46). On June 3, 2020, the United States filed its Reply. (Def.'s Reply, ECF No. 50).[3] This matter is now fully briefed and ripe for decision.

As explained below, the Court finds that genuine issues of material fact exist with regard to both of the United States' arguments, thereby precluding summary judgment. As such, the United States' Motion for Partial Summary Judgment is **DENIED**.

## I.   Background

*A. Purchase and Development of the Silver State Solar Facility*

The Silver State Solar Facility is a solar photovoltaic (PV) power plant located in Clark County, Nevada. (Compl. at 2). The Facility is designed to produce electricity through solar energy, which qualifies the Facility as "energy property" under Section 48(a)(3)(A) of the Internal Revenue Code (I.R.C.) of 1986.[4] (*Id*.). The Facility occupies approximately 1,945 acres of federal land (8 blocks) and has a nameplate capacity[5] of 250 megawatts. (Compl. at 7; Def.'s Mot. Ex. 29 at 2683; Def.'s Mot. Ex. 31 at 2692).

Several parties were involved in the development of the Silver State Solar Facility. Plaintiff was wholly owned "through a chain of disregarded entities and subsidiaries" by NextEra Energy, Inc. ("NextEra"). (Compl. at 3; *see also* Disclosure Statement, ECF No. 4). NextEra is an electric power company that provides electric services and owns generation,

---

[3] In conjunction with its Reply, the United States filed a Motion in Limine to exclude portions of the declarations provided by Plaintiff in its Response. (Def.'s Mot. in Lim., ECF No. 51). That Motion was ruled on by separate Order entered on September 18, 2020. (ECF No. 54).

[4] Section 48(a)(3)(A) dictates properties eligible for energy credits and is incorporated into the tax grant program under § 1603(d).

[5] The United States Energy Information Administration defines this as "[t]he maximum rated output of a generator, prime mover, or other electric power production equipment under specific conditions designated by the manufacturer." *Glossary*, U.S. Energy Information Administration, https://www.eia.gov/tools/glossary/index.php?id=G.

transmission, and distribution facilities to support those services. (Def.'s Mot. at 6, *see also* Def.'s Mot. Ex. 3 at 235).

On September 30, 2013, NextEra contracted with First Solar, Inc. ("First Solar") to purchase the Silver State Solar Facility. (Def.'s Mot. at 8). First Solar designs, manufactures, and sells PV solar modules. (Def.'s Mot. at 5, Ex. 1 at 16). First Solar also develops, designs, constructs, and sells PV "solar power solutions" that primarily use the solar modules that it manufactures. (Def.'s Mot. Ex. 1 at 7). NextEra and First Solar closed the sale of the Silver State Solar Facility on May 23, 2014, and, simultaneously, entered into an Engineering, Procurement and Construction Agreement (the "EPC Agreement") for First Solar to design, engineer, and construct the Facility for a specified contract price. (Compl. at 15). Each block of the facility consists of one or more power conversion stations and the associated PV modules, mounting structures, and interconnecting and other associated equipment. (Compl. at 8). The first block of the Silver State Solar Facility was placed in service on October 15, 2015. (*Id.*). Subsequent blocks were placed into service as they were completed in 2015 and 2016, with the last block placed in service on June 21, 2016. (*Id.*).

### B. Section 1603 of the American Recovery and Reinvestment Act

To stimulate the economy amid a recession, the American Recovery and Reinvestment Act was signed into law on February 17, 2009. *See* Pub. L. No. 111–5, 123 Stat. 115 (Feb. 17, 2009). The purpose of the Act was to make "supplemental appropriations for job preservation and creation, infrastructure investment, energy efficiency and science, assistance to the unemployed, and State and local fiscal stabilization." § 1603, 123 Stat. 115 (as amended by Pub. L. 111–312, tit. VII, § 707, 124 Stat. 3296, 3312). ARRA Section 1603 created a temporary program offering cash payments for qualified investments in clean energy property. Specifically, ARRA Section 1603 permitted investors in qualifying renewable energy properties to apply for a reimbursement of costs in lieu of a tax credit. *See* ARRA § 1603(a)–(c). The statute provides, in relevant part, that:

> SEC. 1603. Grants For Specified Energy Property In Lieu Of Tax Credits.
> (a) IN GENERAL.—Upon application, the Secretary of the Treasury shall, subject to the requirements of this section, provide a grant to each person who places in service specified energy property to reimburse such person for a portion of the expense of such property as provided in subsection (b). No grant shall be made under this section with respect to any property unless such property—
> (1) is placed in service during 2009 or 2010, or
> (2) is placed in service after 2010 and before the credit termination date with respect to such property, but only if the construction of such property began during 2009 or 2010.

ARRA § 1603(a).

The amount of the grant to be awarded, "shall be the applicable percentage of the basis of such property." ARRA § 1603(b)(1). The statute further provides that the "applicable percentage" for solar facilities is equal to 30 percent of the basis. ARRA § 1603(b)(2)(A). Though ARRA Section 1603 is silent on what constitutes "basis" as it applies to specified energy property, the I.R.C. defines "basis" as "the cost of such property." *See* I.R.C. § 1012(a).

Guidance from the Treasury on applying ARRA Section 1603 mirrors this language and states that the basis of property generally is its cost under I.R.C. § 1012. *See* U.S. Treas. Dep't, Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009, at 16 (rev. April 2011).

As it is referred to above, "specified energy property" ("eligible property") is defined by references to I.R.C. §§ 45 and 48. ARRA § 1603(d). ARRA Section 1603(d)(3) provides that specified energy property includes "solar property," which is defined by reference to a definition of "energy property" outlined in § 48(a)(3)(A) of the I.R.C. That section of the I.R.C. further defines the type of solar property relevant in this case as "equipment which uses solar energy to generate electricity." *See* § 48(a)(3)(A)(i).

ARRA Section 1603 defines a specified energy property and provides, in relevant part, that:

> (d) SPECIFIED ENERGY PROPERTY. — For purposes of this section, the term "specified energy property" means any of the following:
> (1) QUALIFIED FACILITIES.—Any qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a qualified facility (within the meaning of section 45 of such Code) described in paragraph (1), (2), (3), (4), (6), (7), (9), or (11) of section 45(d) of such Code.

ARRA § 1603(d). Section 48 of the I.R.C. defines "qualified property" and provides, in relevant part, that "the term 'qualified property' [includes] . . . (I) tangible personal property, or (II) other tangible property (not including a building or its structural components), but only if such property is used as an integral part of the qualified investment credit facility." *See* I.R.C. § 48(a)(5)(D).

The determination of Plaintiff's basis is at the center of this dispute. The relevant Treasury guidance on this point provides:

> The basis of property is determined in accordance with the general rules for determining the basis of property for federal income tax purposes. Thus, the basis of property generally is its cost (IRC [S]ection 1012), unreduced by any other adjustment to basis, such as that for deprecation, and includes all items properly included by the taxpayer in the depreciable basis of the property, such as installation costs and the cost for freight incurred in the construction of the specified energy property.

U.S. Dep't of Treasury, *Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009 Program Guidance* 16 (Apr. 2011), *available at* http://www.treasury.gov/initiatives/recovery/Documents/GUIDANCE.pdf. As the Federal Circuit recently observed, "Congress intended that Treasury award grants under ARRA Section 1603 similar to how it has always awarded tax credits under Section 48—*i.e.*, by fairly allocating the basis according to the use of that property." *WestRock Va. Corp. v. United States*, 941 F.3d 1315, 1319 (Fed. Cir. 2019).

C.  *Plaintiff's Application under ARRA Section 1603 and Treasury Award*

      From February to August of 2016, after each block of the Silver State Solar Facility was placed into service, Plaintiff filed the relevant cash grant applications requesting total cash grants of $289,103,305. (Compl. at 2, 10). Plaintiff's self-ascribed cost basis included its costs in developing and constructing the Facility—this included the direct costs of solar PV modules and other equipment, costs for other tangible property (e.g., roads for operations and maintenance), and indirect costs allocated and capitalized to Plaintiff's qualified property. (Compl. at 9). Plaintiff claims its stated basis excluded non-qualifying equipment and costs such as those relating to transmission, land, and intangible assets. (*Id.*).

      After a voluntary revision of the original applications, Plaintiff's applications for each block of the Facility reported the following eligible cost basis and requested grant amounts based on 30 percent of the reported eligible cost basis:

| Application Block | Eligible Cost Basis | Grant Amounts Requested |
|---|---|---|
| Block 1 | $112,380,942 | $33,714,283 |
| Block 2 | $99,563,649 | $29,869,095 |
| Block 3 | $132,751,037 | $39,825,311 |
| Block 4 | $127,618,150 | $38,285,445 |
| Block 5 | $126,028,454 | $37,808,536 |
| Block 6 | $132,080,087 | $39,624,026 |
| Block 7 | $127,053,531 | $38,116,059 |
| Block 8 | $106,201,833 | $31,860,550 |
| **Total** | **$963,677,683** | **$289,103,305** |

(Compl. at 11).

      The Treasury reviewed the applications and, during the review process, asked for additional information to substantiate the claimed basis. (*Id.*; Def.'s Mot. at 22). On November 9, 2016, the Treasury issued identical award letters for each block. The Treasury indicated that it was making an "interim payment" to Plaintiff "based on the information that is available to date" and pending "a final assessment of the applicant's claim." (Compl. at 12). The Treasury concluded that Plaintiff failed to substantiate its claimed basis and reduced its ARRA § 1603 grant from its applied-for payment of $289,103,305—corresponding to a claimed eligible cost basis of $963,677,683—to an awarded payment of $152,402,630, having determined an eligible cost basis of $508,008,767. (*Id.*; Def.'s Mot. at 21). Further, the Treasury reduced the payment by 6.9 percent to $141,886,849 under the Balanced Budget and Emergency Deficit Control Act of 1985, as amended.[6] (Compl. at 12). The reduced grant amounts are shown below:

---

[6] Sequestration in this instance means the reduction in Cash Grants resulting from reductions in government spending required by the Balanced Budget and Emergency Deficit Control Act of 1985 or other law or awards made on or after October 1, 2015, but on or before September 30, 2016. (Def.'s Mot. Ex. 9 at 710; *see also* Pl.'s Resp. Ex. F at 148).

| Application Block | Grant Amount Requested | Award Before Sequestration | Award After Sequestration |
|---|---|---|---|
| Block 1 | $33,714,283 | $15,451,430 | $14,385,281 |
| Block 2 | $29,869,095 | $16,360,200 | $15,231,346 |
| Block 3 | $39,825,311 | $21,813,750 | $20,308,601 |
| Block 4 | $38,285,445 | $20,904,750 | $19,462,322 |
| Block 5 | $37,808,536 | $20,523,600 | $19,107,472 |
| Block 6 | $39,624,026 | $21,432,600 | $19,953,751 |
| Block 7 | $38,116,059 | $20,523,600 | $19,107,472 |
| Block 8 | $31,860,550 | $15,392,700 | $14,330,604 |
| Total | $289,103,305 | $152,402,630 | $141,886,849 |

(*Id.*).

On June 30, 2017, the Treasury issued a final determination, stating: "[W]e have determined that no additional payment is appropriate at this time. The payments issued in November 2016 reflect an amount that is more consistent with the eligible property's fair market value than is the basis claimed in the ARRA Section 1603 application." (Compl. at 13). The difference in the amounts requested versus the amount granted was attributable solely to different methods for calculating basis. As a result, Plaintiff brought suit to recoup the remainder of the cash grants that it believes it is entitled to.

## II.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A "genuine dispute" exists where a reasonable factfinder "could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those which might significantly alter the outcome of the case; factual disputes which are not outcome-determinative will not preclude summary judgment. *Id.* In determining whether summary judgment is appropriate, the court should not weigh the credibility of the evidence, but simply "determine whether there is a genuine issue for trial." *Id.* at 249. In so deciding, the Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578–88 (1986).

The Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. § 1491 (2016). The Tucker Act waives sovereign immunity and provides this Court with jurisdiction over specific categories of claims against the United States, including those claims "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department . . . in cases not sounding in tort." § 1491(a)(1). "[T]he claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983) (internal citation and quotation marks omitted). ARRA Section 1603 is a money mandating statute that vests jurisdiction in this Court pursuant to the Tucker Act, as it does not afford the Government with discretion to deny an application for reimbursement so long as the requirements of ARRA Section 1603 are otherwise met. *W.E. Partners II, LLC v. United States*, 119 Fed. Cl. 684, 690 (2015); *LCM Energy Sols. v. United States*, 107 Fed. Cl. 770, 772 (2012); *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 21–22 (2011).

6

When interpreting a statute, the Court must start with the plain language. *Barela v. Shinseki*, 584 F.3d 1379, 1382–83 (Fed. Cir. 2009) (citation omitted). Statutes are not, however, interpreted in a vacuum and the Court "must consider not only the bare meaning of each word but also the placement and purpose of the language within the statutory scheme." *Id*. at 1383 (citation omitted). As such, a statute's meaning, regardless of whether the language is plain or not, depends on the context. *Id*. (citation omitted). In *W.E. Partners II*, this Court held that a lesser standard of deference should apply to the Treasury's interpretation of ARRA Section 1603 for four reasons. 119 Fed. Cl. at 691–92. First, the Court found I.R.S. Notice 2008–60 and the Treasury Guidance for ARRA Section 1603 to represent an agency-wide policy. *Id*. at 692. Second, the Court found that this guidance had not been formulated belatedly in response to litigation. *Id*. Third, the Court found that the reasons for the agency's guidance were clear. *Id*. Lastly, the Court found that the Treasury "is explicitly granted recapture authority for any grants to property that ceases to be 'specified energy property'" in ARRA Section 1603(f) and that this authority—and the discretion afforded to the agency—"suggest Congress's intent to defer to the agency with the administration of [ARRA Section 1603]." *Id*. As such, the Court reviews claims challenging an unfavorable determination by the Treasury regarding an application for a grant payment under ARRA Section 1603 *de novo*. *Id*. at 690.

### III.   Discussion

The United States advances two arguments in support of its reduction in Plaintiff's basis. Its initial argument is that I.R.C. § 1060–which calls for the "residual method"[7] of tax accounting—applies to this transaction. (Def.'s Mot. at 23). Using that method, the United States argues that a substantial portion of Plaintiff's assets must be allocated to intangibles such as goodwill and going concern value, which ultimately reduces Plaintiff's ARRA Section 1603 cost-eligible basis. (*Id*.). As a second argument, the United States asserts that the Power Purchase Agreement (PPA), acquired when NextEra purchased the Silver State Solar Facility, is an intangible asset under § 197 and therefore ineligible property for purposes of ARRA § 1603. (Def.'s Mot. at 37). The Court will address each argument in turn.

   A.  *Application of I.R.C. § 1060*

The United States argues that when NextEra acquired the Silver State Solar Facility and contracted for development by First Solar, it, in turn, acquired a bundle of assets that would constitute a "trade or business," to which "goodwill or going concern value could under any circumstances attach." (Def.'s Mot. at 1). Under those circumstances, the United States asserts that I.R.C. § 1060 must be applied to determine proper allocation of the purchase price between eligible and ineligible property under ARRA § 1603, ultimately resulting in a lower basis. (*Id*.). Plaintiff offers three counterarguments: (1) NextEra did not acquire a "trade or business," but instead acquired development rights; (2) summary judgment is improper when tax regulations mandate the Court's weighing of "all the facts and circumstances surrounding the transaction" and involve highly fact-intensive inquiries; and (3) the tax basis in the Facility was not determined "wholly by reference" to the purchase price paid for Plaintiff's assets, as required by

---

[7] Treasury Regulations under § 338 set out the "residual method" of allocation in which the consideration is distributed among seven asset classes. Those asset classes include tangible assets and Section 197 intangible assets where goodwill and going concern value are broken out from all other Section 197 intangible assets.

7

I.R.C. § 1060(c)(2). (Pl.'s Resp. at 15). The Court finds that such a factually intensive analysis precludes a finding "as a matter of law" for the United States; thus, summary judgment as to the application of I.R.C. § 1060 is improper at this time.

I.R.C. § 1060 requires that, in the case of an applicable asset acquisition, "the consideration received . . . be allocated among such assets acquired . . . in the same manner as amounts are allocated to assets under [§] 338(b)(5)." Treasury Regulations under § 338 set out the "residual method" of allocation in which the consideration is distributed among seven classes of assets—(1) cash and general deposit accounts; (2) actively traded personal property, certificates of deposits, U.S. government securities and publicly traded stocks; (3) debt instruments; (4) inventory and other property held for sale to customers; (5) assets that do not fit within any other class, including tangible property; (6) I.R.C. § 197 intangibles, including contract rights, but not goodwill and going concern value; and (7) goodwill and going concern value. *See* Treas. Reg. § 1.338-6(b). The consideration is allocated among these classes in the order they are listed in a "waterfall" fashion, using the fair market value of the assets within each class. *See* Treas. Reg. § 1.338-6(b).

An "applicable asset acquisition" under I.R.C. Section 1060 "means any transfer . . . of assets which constitute a trade or business, and with respect to which the transferee's basis in such assets is determined wholly by reference to the consideration paid for such assets." 26 U.S.C. I.R.C. § 1060(c). The Treasury promulgated regulations that further elaborate on the circumstances in which assets constitute a trade or business. *See* 26 C.F.R. § 1.1060-1(b)(2). Under that Regulation, assets constitute a trade or business if their "character is such that goodwill or going concern value could under any circumstances attach to such [assets]." § 1.1060-1(b)(2)(i)(B). "Goodwill is the value of a trade or business attributable to the expectancy of continued customer patronage." § 1.1060-1(b)(2)(ii). "Going concern value is the additional value that attaches to property because of its existence as an integral part of an ongoing business activity." § 1.1060-1(b)(2)(ii). Going concern "includes the value attributable to the ability of a trade or business . . . to continue functioning or generating income without interruption notwithstanding a change in ownership." § 1.1060-1(b)(2)(ii). Going concern value "also includes the value that is attributable to the immediate use or availability of an acquired trade or business . . . .." § 1.1060-1(b)(2)(ii).

For purposes of determining the basis of property eligible for an ARRA § 1603 payment, the Court must look to "the general rules for determining the basis of property for federal income tax purposes." (Def.'s Mot. Ex. 33 at 2738 (Treasury Guidance)); *see W.E. Partners II, LLC*, 119 Fed. Cl. at 690 ("The Court finds that ARRA Section 1603 grants are properly restrained by the limitations on eligible cost basis found in the Treasury Guidance."); *see also* I.R.C. § 1012(a) ("In general, . . . [t]he basis of property shall be the cost of such property.")).

At the outset of this argument, the Court must address the Federal Circuit's ruling on the relationship between ARRA Section 1603 and I.R.C. Section 1060 in *Alta Wind I Owner Lessor C v. United States*, 897 F.3d 1365 (Fed. Cir. 2018). *Alta Wind* concerned six completed wind farm facilities near Los Angeles purchased from a developer, Terra-Gen. *Id*. at 1369. Five of those transactions were sale-leasebacks of the Alta Wind facilities in which plaintiffs acquired the wind farm and leased it back to Terra-Gen to operate the wind farm and pay rent to plaintiffs. *Id*. At the time of the transactions, the wind farm facilities were on the cusp of operation and they had executed power purchase agreements with a customer; no further construction or

development work was necessary. *Id*. at 1375. Within weeks of the transactions, plaintiffs placed each wind farm into service and applied for ARRA Section 1603 grants, the basis reflecting the price of Alta Wind and Terra-Gen's transaction as grant-eligible property. *Id*. at 1369–70. Like in this case, the United States, advocating for use of the residual method, and Alta Wind, who did not attribute any of the purchase price to intangibles, disagreed on the correct method for calculating basis. *Id*. at 1368. That disagreement left $206 million in additional grant payments at issue. *Id*. After a nine-day trial, the trial court found for plaintiffs, finding that no goodwill or going concern value could have existed at the time of the transfer because the facilities were not yet operational. *Alta Wind I Owner-Lessor C v. United States*, 128 Fed. Cl. 702, 722, 716 (2016). The Federal Circuit disagreed, holding that it was readily apparent that goodwill could attach once the wind farms began operation immediately after the transaction and this expectation of goodwill was baked into each purchase price. *Alta Wind*, 897 F.3d. 1375.

      Here, the United States argues that this case is analogous to *Alta Wind* and, therefore, I.R.C. Section 1060 applies to this transaction as a matter of law. (Def.'s Mot. at 29). Though the Court finds significant guidance from the *Alta Wind* decision, it is not outcome-determinative in this instance. This case is factually distinguishable in that the *Alta Wind* acquisition concerned the sale of the *completed* wind farms; the Federal Circuit describes those wind farms as "on the cusp of operation" and operations occurring "immediately after the transaction." *See* 897 F.3d at 1375. When the rights to the Silver State Solar Facility were transferred, there was no completed solar facility at the site. (Def.'s Mot. Ex. 16 at 1411 (PPA Site Description)). Particularly telling in *Alta Wind*, the Federal Circuit held that "[w]hile it may not be relevant that a new entity expects goodwill to be generated at some distant future time, we think the regulation is clearly applicable in the circumstances of this case, where goodwill could attach to the transferred assets immediately after the transaction in question." 897 F.3d at 1375. As the United States notes, construction of the Silver State Solar Facility would begin in a second phase *after* NextEra's acquisition of a partially developed project. (Def.'s Mot. at 13–15). This situation falls into the first scenario noted by the Federal Circuit—when the transaction is attenuated from the operation of a fully constructed power plant—whereas the wind farms in *Alta Wind* were "on the cusp of operation" with a dedicated customer ready to receive and buy all their power "immediately after the transaction." 897 F.3d at 1375. In *Alta Wind*, a nine-day trial took place and the trial court had the ability to consider all relevant evidence and weigh credibility of witnesses. *Id.* at 1371. While facts at trial here could ultimately lead to application of the residual method, *Alta Wind* does not require such a finding as a matter of law. As such, the Court must determine whether goodwill or going concern attaches based on the record before it.

      The United States maintains that when acquired assets are a combination of tangible and intangible assets that would collectively yield an "operational solar electrical generating enterprise," the Court must apply the rules relevant to "applicable asset acquisitions" under I.R.C. § 1060 and Treasury Regulation § 1.1060-1(a)–(c). (Def.'s Mot. at 23). Ultimately, the Court finds that such findings require a highly factual inquiry that cannot be achieved absent trial where the underlying facts remain disputed.

      To determine whether goodwill or going concern value could attach to a group of assets, "all the facts and circumstances surrounding the transaction are taken into account," including, but not limited to:

>   (A) The presence of any intangible assets . . . ;
>   (B) The existence of an excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased (other than goodwill and going concern value) as shown in the financial accounting books and records of the purchaser; and
>   (C) Related transactions, including lease agreements, licenses, or other similar agreements between the purchaser and seller . . . in connection with the transfer.

§ 1.1060-1(b)(2)(iii). The United States urges the Court to consider two agreements as a single asset, as well as a finding that "goodwill" and "going concern" could "under any circumstances" attach. (Def.'s Mot. at 25–36).

After preliminary negotiations concluded between First Solar and NextEra, on April 26, 2013 the parties executed a Letter of Intent which became the framework for NextEra to acquire the Silver State Solar Facility. (Def.'s Mot. Exs. 7, 8 at 659). Consequently, the parties negotiated two principal agreements which formed the basis for the transaction: (1) the Membership Interest Purchase and Sale Agreement ("MIPSA"), whereby First Solar sold to NextEra the Silver State Solar project entity and the assets contained therein; and (2) the Engineering Procurement and Construction Agreement ("EPC Agreement"), whereby NextEra hired First Solar to construct the Silver State Solar Facility. (*See* Def.'s Mot. Exs. 4 (EPC Agreement), 9 (MIPSA), 11 at 1191).

On September 30, 2013, the parties executed the MIPSA, which laid out the terms and conditions for the sale of the Facility and its development. (Def.'s Mot. Ex. 9.). These agreements are closely related. Upon closing of the MIPSA, NextEra would acquire all of First Solar's ownership interests and rights to Silver State Solar Power South, LLC, the legal entity that owned the project's development rights and assets. (*Cf.* Def.'s Mot. Ex. 4 and Def.'s Mot. Ex 9). When NextEra and First Solar executed the MIPSA, First Solar had not yet acquired all necessary permits to construct the Facility. (Def.'s Mot. Ex. 11 at 1183). In addition to the requirement that First Solar obtain necessary permits, as a condition to its closing, the MIPSA required that the EPC Agreement between the parties be executed on or before the same day as the MIPSA closing. (Def.'s Mot. Ex. 9 at 720, Section 2.4(a)(iii) (MIPSA)). The EPC Agreement was incorporated as an exhibit to the MIPSA. (Def.'s Mot. Ex 9 at 818 (MIPSA, Exhibit M)). Lastly, the MIPSA established the pricing methodology for the EPC agreement. (Def.'s Mot. at 714–15). In connection with the MIPSA and EPC transactions, First Solar and NextEra entered into a tax indemnity agreement, referred to as the "Cash Grant Agreement," which provided partial indemnification to NextEra (up to $100 million) if the ARRA Section 1603 cash grants were less than the grant amounts assumed in the financial model negotiated by the parties. (Def.'s Mot. Ex. 14 (Cash Grant Agreement)). The closing for the MIPSA and the EPC Agreement occurred on May 23, 2014. (Def.'s Mot. Ex. 4 (EPC Agreement)).

In determining whether goodwill has attached, Treasury Regulations provide that the relevant inquiry is whether "[the assets'] character is such that goodwill . . . could under any circumstances attach to such group." Treas. Reg. § 1.1060-1(b)(2)(i)(B). Further, the regulations provide that "[w]hether sufficient consideration is available to allocate to goodwill or going concern value after the residual method is applied is not relevant in determining whether goodwill or going concern value could attach to a group of assets" and therefore whether the

residual method must be applied. Treas. Reg. § 1.1060-1(b)(2)(iii). Thus, "[t]here is no need to show that a transaction had actual, accrued goodwill or going concern value at the time of the transaction." *Alta Wind*, 897 F.3d at 1373. To reiterate, "going concern value" is defined as "the additional value that attaches to property because of its existence as an integral part of an ongoing business activity," and "includes the value that is attributable to the immediate use or availability of an acquired trade or business." Treas. Reg. § 1.1060-1(b)(2)(ii).

With the MIPSA, NextEra acquired preconstruction development rights that cannot, on the record before the Court, be clearly classified as a trade or business as there was no present ability to generate, transmit, or sell power. (Pl.'s Resp. at 18; Pl.'s Resp. Ex. B at 13 (Declaration of Max Gardner)). The United States argues, as evidence of goodwill, that prior to transferring rights to the Silver State Solar Facility, First Solar had already executed a PPA and a Large Generator Interconnection Agreement with Southern California Edison (SCE). (Def.'s Mot. at 32). However, Plaintiff disagrees with the characterization of Southern California Edison as anything other than a potential client, arguing that the United States' assertion assumes that construction and completion of the Facility were guaranteed. (Pl.'s Resp. at 18). Plaintiff also argues that at the MIPSA date, the PPA was an executory contract subject to future conditions and potential termination. (*Id.* at 19). Plaintiff produced the expert report of Dr. Nancy Ryan, who stated: "an executed [and approved] PPA did not guarantee that a project would be built. Given the long lead-time for utility-scale projects and the extended period after CPUC ["California Public Utilities Commission"] approval until operational completion, any number of different issues might arise that could prevent the project from succeeding . . .." (Pl.'s Resp. Ex. C at 84).

Further, the United States also claims that Silver State had a "quantitative dimension of goodwill," relying on the Facility being "a substantial profit" to First Solar. (Def.'s Mot. at 33). However, the Federal Circuit has held that "[g]oodwill, an intangible asset, is the excess of cost over the fair value [not fair market value] of the identifiable net assets acquired." *Coast Fed. Bank, FSB v. United States*., 323 F.3d 1035, 1039 (Fed. Cir. 2003) (emphasis added). As such, First Solar's costs and profits are irrelevant to the application of I.R.C. § 1060, and consideration of such would be improper.

The United States' position is that NextEra acquired future trade or business through the EPC Agreement for the design, engineering, and construction of the Facility and that, because the EPC Agreement was integrated into the MIPSA, they must be considered together. (Def.'s Mot. at 25). However, the Court is unpersuaded. Treasury Regulations provide that, in order to indicate the existence of goodwill or going concern value, "[r]elated transactions, including lease agreements, licenses, or other similar agreements between the purchaser and seller (or managers, directors, owners, or employees of the seller) in connection with the transfer" can be considered. § 1.1060-1(b)(2)(iii)(C). This is not an exhaustive list of considerations. While the documents are indeed related, different rights are transferred therein. The MIPSA, for instance, transfers to NextEra ownership rights to the Silver State Solar Facility. (*See generally* Def.'s Mot. Ex. 9 (MIPSA)). The EPC Agreement, on the other hand, engages First Solar to design, engineer, and construct the Facility for a specified contract price. (*See generally* Def.'s Mot. Ex 4 (EPC Agreement)). While NextEra and First Solar were indeed parties to both documents, it cannot be said that the EPC Agreement constitutes a lease agreement, a license, or another similar agreement as contemplated by § 1.1060-1(b)(2)(iii)(C). Based on consideration of evidence of record, and because the substance of the contracts concerns substantially different rights, the

11

Court will not consider the MIPSA and EPC Agreement as one asset for purposes of this motion. A more fulsome record developed at trial may yield a different result.

Cases that require weighing of evidence, credibility determinations, and findings as to the intent of the parties to the transactions are "particularly unsuited to disposition on summary judgment." *See NovaCare, Inc. v. United States*, 52 Fed. Cl. 165, 181 (2002). The Federal Circuit has stated that "[i]ntent is a factual matter which is rarely free from dispute," *Albert v. Kevex Corp.*, 729 F.2d 757, 763 (Fed. Cir. 1984). The same is true here. The Court finds that the intent of the contracting parties is blatantly disputed here—as evidenced by the multiple declarations and depositions of witnesses from both NextEra and First Solar. Further, when determining whether goodwill or going concern value could attach to a group of assets, the Court must account for the facts and circumstances surrounding the transaction—something it cannot do at this stage. As such, considering "all the facts and circumstances surrounding the transaction," genuine issues of material facts exist which preclude summary judgment as to the application of I.R.C. § 1060.

B. The Power Purchase Agreement

The United States further requests a determination as to whether the PPA should be separately capitalized under the tax code.[8] (Def.'s Mot. at 37). The United States contends that the PPA, as an intangible asset, must be recognized as an independent asset for purposes of determining basis. (*Id.*). Plaintiff counters that because the PPA is a facility-specific contract, it cannot be treated as a separate intangible asset for ARRA Section 1603 grant purposes and that it is not a "customer-based intangible" under § 197(d)(2)(A)(iii). (Pl.'s Resp. at 38–48). Plaintiff further maintains that the classification of the PPA as intangible property, including whether the PPA is a separate intangible asset from the Facility and whether it is "above-market," is improper for summary judgment as it requires expert testimony, economic and valuation analysis, and weighing of the facts and circumstances. (*Id.* at 38). The Court agrees with Plaintiff that characterizing the PPA involves a highly factual inquiry and is not appropriate for summary judgment.

Section 197(d)(1)(C)(iv) specifies that a "section 197 intangible" includes "any customer-based intangible." Under that provision, "customer-based intangibles" mean any other value resulting from future provisions of goods or services pursuant to relationships (contractual or otherwise) in the ordinary course of business with customers. I.R.C. § 197(d)(2)(A)(iii). Treasury Regulation § 1.197–2(b)(6), further defines a customer-based intangible as:

> [A]ny composition of market, market share, or other value resulting from the future provision of goods or services pursuant to contractual or other relationships in the ordinary course of business with customers. Thus, the amount paid or incurred for customer-based intangibles includes, for example, any portion of the purchase price of an acquired trade or business attributable to the existence of a customer base, a circulation base, an undeveloped market or market growth, insurance in force, the existence of a qualification to supply goods or services to a particular customer, a mortgage

---

[8] The Court would note that the United States moves for a ruling that the PPA has its own quantifiable basis that is distinct from the basis of facility's § 1603-eligible property; there is no request for the Court to separately value the PPA.

> servicing contract[,] . . . an investment management contract, or other relationship with customers involving the future provision of goods or services.

Treas. Reg. § 1.197–2(b)(6). Tax law recognizes that inseparable attributes of tangible property are not separate intangible assets. For example, the cost to acquire licenses, permits, and land improvement rights is not treated as a separate intangible asset but is treated in the same manner as the underlying improvement. § 1.197-2(c)(3). I.R.C. § 197(e)(5) goes on to exclude "an existing lease of tangible property" as intangibles, and the Regulations under this section explain:

> Section 197 intangibles do not include any interest as a lessor under an existing lease or sublease of tangible real or personal property. In addition, the cost of acquiring an interest as a lessor in connection with the acquisition of tangible property is taken into account as part of the cost of the tangible property. For example, if a taxpayer acquires a shopping center that is leased to tenants operating retail stores, any portion of the purchase price attributable to favorable lease terms is taken into account as part of the basis of the shopping center and in determining the depreciation deduction allowed with respect to the shopping center. (See section 167(c)(2).)

§ 1.197-2(c)(8)(i).

Treasury Regulation § 1.197-2(f)(4)(ii) provides, "[I]n the case of a section 197 intangible acquired in an applicable asset acquisition within the meaning of I.R.C. Section 1060(c), the basis shall be determined pursuant to I.R.C. Section 1060(a) and the regulations thereunder." Thus, where a section 197 intangible is acquired in the context of an applicable asset acquisition under I.R.C. § 1060, then the basis of the intangible asset is determined pursuant to the residual method set forth under the I.R.C. § 1060 regulations. Treasury Regulation § 1.197-2(f)(4)(ii) indicates that if an asset is a section 197 intangible, and I.R.C. § 1060 applies, then any amount paid to acquire the section 197 intangible must be allocated consistently with the waterfall method specified by § 1.338-6, *i.e.*, as a Class VI asset. Thus, the United States argues that any amount paid for a section 197 intangible cannot be allocated to the tangible property (Class V) under the waterfall method of § 1.338-6. (Def.'s Mot. at 44).

Before the Court is how to correctly classify the PPA for purposes of ARRA Section 1603. A PPA is a contract between an entity that produces and sells power, and an entity that buys power, generally a utility company. Prior to the sale of the Silver State Solar Facility to NextEra, First Solar completed various development-stage tasks. As noted in the previous section, First Solar executed a PPA with SCE in February 2011, approximately 39 months prior to the close of the Silver State acquisition by NextEra. (Def.'s Mot. Exs. 16 (PPA); 26 at 1963). The relevant PPA provides that, for 20 years, SCE would purchase all the electrical output produced at the Silver State Solar Facility, at an "Energy Price" of $102.20 per MWh. (Def.'s Mot. Ex. 16 at 1288–89).

There is some disagreement among the parties as to *Alta Wind's* application to the PPA. The lower court decision in *Alta Wind*, expressly analyzed the PPA in that case, holding:

> [T]he Court finds Plaintiffs' treatment of the PPAs more persuasive. Plaintiffs' approach treats the PPAs like land leases. A land lease is not

13

> considered a separate asset from the underlying land, even if the land lease terms are better than market. *See Schubert v. Comm'r*, 33 T.C. 1048, 1053 (1960), *aff'd,* 286 F.2d 573 (4th Cir. 1961). As with land leases—which relate only to the specific parcel of land leased—the PPAs each relate only to their specific wind farm facilities and are not transferable or assignable. Maydew, Tr. 1439; Pagano, Tr. 393–94; PX 326 at 19 ¶ 1c. Dr. Maydew found that these characteristics mean the PPAs may not be viewed as separate assets from their underlying facilities from a tax accounting perspective. Maydew, Tr. 1438; PX 326 at 18 ¶ 1. Therefore, the close nexus between the wind farm facilities and their respective PPAs means that the PPAs cannot be viewed as separate intangible assets.

128 Fed. Cl. at 721. Notably, the trial court cites to both expert and lay witness testimony in coming to that finding. Plaintiff correctly states that, though the decision was reversed on other grounds, the Federal Circuit did not disturb this holding. (Pl.'s Resp. at 40). The Federal Circuit in *Alta Wind* held that "PPAs, or at least some portion thereof, may be characterized as customer-based intangible assets under I.R.C. § 197." *Alta Wind*, 897 F.3d at 1373–74. *Alta Wind* left open the separate intangible asset issue.

      Plaintiff states that a PPA relates only to a specific facility, cannot be transferred or assigned separate from that facility, and simply captures the economic value of the output of its facility. (Pl.'s Resp. at 38; *see also* Pl.'s Resp. Ex. A at 23). While this may suggest some presence of goodwill, a suggestion is not enough. One of Plaintiff's expert declarants, Dr. Nancy Ryan, states, "A PPA, no matter its pricing, has no value if the project does not go forward. It lives or dies with its underlying project." (Pl.'s Resp. Ex. C at 258). Like the plaintiffs in *Alta Wind,* Plaintiff uses this argument to say that the PPA is more analogous to a lease. Treasury Regulations provide that "[i]f any property is acquired subject to a lease—(A) no portion of the adjusted basis shall be allocated to the leasehold interest, and (B) the entire adjusted basis shall be taken into account in determining the depreciation deduction (if any) with respect to the property subject to the lease." I.R.C. § 167(c)(2).

      As to whether the PPA is considered a "customer-based intangible," as a matter of law, Plaintiff has sufficiently shown a genuine issue of material fact. First, the relevant regulation references "value." While the United States does not move this Court to value the PPA itself, value characterizations are improper for resolution on summary judgment. Plaintiff correctly states that valuation involves the careful weighing of evidence, findings of fact, and expert testimony at trial. (Pl.'s Resp. at 44). Plaintiff has offered three experts to address the proper characterization of the PPA and its valuation and accounting treatment. Further, the definition of "customer-based intangible" presents the same intensely factual trade or business issues discussed previously for I.R.C. § 1060 purposes by inquiring whether there is a "relationship[ ] . . . in the ordinary course of business with customers." § 197(d)(2)(A)(iii). The Regulations reference "an acquired trade or business." *See* § 1.197-2(b)(6). Plaintiff's expert declarant, Dr. Ryan, states: "PPAs effectively attached a future revenue stream to an undeveloped project, but realizing those revenues was contingent upon that project achieving commercial operation in the negotiated timeframe, consistent with the specified parameters." (Pl.'s Resp. Ex. C at 93). For the same reasons as with I.R.C. § 1060, the Court is not in a position to make this finding at this juncture.

Like the general application of I.R.C. Section 1060 as described about, classification of the subject PPA is a highly factual inquiry requiring an examination of the full context of the transactions in this case. The PPA's classification is a disputed factual issue that must await trial. On that basis, there exists a genuine issue of material fact thereby precluding summary judgment.

### IV.     Conclusion

While the briefing has provided a useful summary of the parties' respective positions, the Court needs to weigh the evidence, make credibility determinations, and draw legitimate inferences from the facts. Rather than deciding the case on a summary judgment motion, the Court finds that the "better course would be to proceed to a full trial." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *see also* RCFC 56.

Looking at "all the facts and circumstances surrounding the transaction" and giving particular consideration to the three factors set out in the Treasury regulations, the Court finds that genuine disputes of material facts exist as to the issues presented by the United States' motion. As such, the pending Motion for Partial Summary Judgment is **DENIED** on both grounds.

The Court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all the parties agree. By no later than October 26, 2020, the parties shall file a joint status report indicating their agreement with the proposed redactions, attaching a copy of those pages of the Court's ruling containing proposed redactions, with all proposed redactions clearly indicated. The parties also shall, by the same date, file any redacted versions of documents they filed under seal in this case to the extent such redacted versions have not already been filed.

Finally, in the same joint status report, the parties shall propose dates for a telephonic status conference in order to establish a further litigation schedule.

**IT IS SO ORDERED.**

s/     David A. Tapp
DAVID A. TAPP, Judge